2017 IL App (1st) 153593

FOURTH DIVISION
January 26, 2017

No. 1-15-3593

---

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| MAI LEEN AGUILAR-SANTOS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 L 3952 |
| | ) | |
| HELEN BRINER, | ) | Honorable |
| | ) | Diane Shelley, |
| Defendant-Appellant. | ) | Judge Presiding. |

---

JUSTICE BURKE delivered the judgment of the court, with opinion.
Presiding Justice Ellis and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1                                          I. BACKGROUND

¶ 2         This case arises from an automobile accident that occurred on July 28, 2008, between Mai Leen Aguilar-Santos, plaintiff, and Helen Briner, defendant. On April 1, 2010, plaintiff filed a complaint in the circuit court of Cook County, seeking to recover damages as a result of defendant's negligence in causing the accident. Plaintiff alleged that she suffered injuries to her lower back and neck from the impact and burns to her arm from the deployment of the airbag. Defendant filed an answer, denying any negligence and asserting the affirmative defense of plaintiff's own negligence.

¶ 3 On July 15, 2013, the trial court granted plaintiff's motion for partial summary judgment, finding that defendant breached the duty of ordinary care. Defendant filed an amended answer, admitting that her negligence was the proximate cause of plaintiff's injuries. Defendant denied, however, that plaintiff was injured to the extent that she claimed or that the injuries she sustained as a result of the accident were permanent. Prior to trial, defendant conducted evidence depositions of two of plaintiff's treating physicians, Dr. Richard Lim and Dr. Michel Malek.

¶ 4 A. Rule 213(f) Disclosures

¶ 5 Plaintiff filed her initial Supreme Court Rule 213(f) interrogatory answers on February 25, 2011 (Ill. S. Ct. 213(f) (eff. Jan.1, 2007)). In those answers, plaintiff identified Dr. Lim as one of plaintiff's treating physicians who may be called to testify at trial. The answers further provided that Dr. Lim would testify "that said injuries and symptoms identified in the medical records are caused by the accident" and that "[p]laintiff's condition may deteriorate with age or treatment." The answers further disclosed that Dr. Lim would "rely upon the radiographic studies contained in the medical records." Finally, plaintiff disclosed that she would "be seeing [Dr. Lim] again before trial either for treatment or to update the doctor's opinion."

¶ 6 On August 7, 2012, plaintiff filed supplemental answers to the initial interrogatory answers filed on February 25, 2011. In the supplemental answers, plaintiff disclosed that she recently returned to Dr. Lim's office. Based upon this recent examination, plaintiff expected Dr. Lim to testify that she required future and further medical treatment to treat her pain and problems related to the automobile collision. Plaintiff further disclosed that Dr. Lim "is expected to rely on any and all other medical records of the plaintiff from other doctors and hospitals." Under Dr. Lim's name on the disclosures is a notation to "See attached records." Attached to the supplemental answers, plaintiff included a medical record from April 2, 2012. The record

provides that plaintiff "continues to be symptomatic with respect to the cervical spine" and that plaintiff's "MR scan was reviewed from November 2011 and shows herniated disc at C5-6. The patient was examined with Dr. Lim and he reviewed these studies." Plaintiff also included a copy of the Magnetic Resonance Imaging (MRI) from November 2011.

¶ 7                                    B. Motions *in Limine*

¶ 8                               *1. Defendant's Motion in Limine 15*

¶ 9        Prior to the beginning of the jury trial, defendant filed a number of motions *in limine*. In motion *in limine* 15, defendant requested that the trial court "preclude evidence of permanency, future pain and suffering, and future loss of normal life." In this motion, defendant contended that in his evidence deposition, Dr. Lim did not offer any opinions regarding the permanency of plaintiff's condition. Defendant further contended that the court should sustain her objection to Dr. Malek's testimony at his evidence deposition that plaintiff sustained a permanent injury. In support of this contention, defendant asserted that Dr. Malek last saw plaintiff on March 5, 2014, 15 months prior to his evidence deposition, which meant that it was not a recent examination under Illinois law for establishing the permanency of plaintiff's condition. Defendant further asserted that Dr. Malek saw plaintiff only six times during a two-year period, and, therefore, lacks the proper foundation to support a claim for permanency. In denying defendant's motion *in limine* 15, the trial court stated that the recency of the exam was only one factor the court could consider in determining whether to permit admission of the evidence. The court further recognized that at this point in the trial, the only issue was the admissibility of the evidence regarding permanency, and not the weight that the jury may give to that evidence.

¶ 10                         *2. Defendant's Motion in Limine 16*

¶ 11        In motion *in limine* 16, defendant contended that the trial court should "bar any claim for future medical expenses." Defendant asserted that neither Dr. Lim nor Dr. Malek testified as to the cost of any future medical treatment in their evidence depositions and that plaintiff identified no other witness who could testify as to the cost of treatment that plaintiff may incur in the future. At a hearing on defendant's motion, defendant asserted that there was insufficient evidence regarding the manner of plaintiff's future treatment to support a claim to recover future expenses for her prescription medication. The court noted that the interrogatory answers dated August 7, 2012, indicated that Dr. Malek would testify that plaintiff would probably need future medical treatment and will incur bills associated with that treatment and that the doctor would discuss the cost of future treatment. The court then denied defendant's motion *in limine* 16, but stated that it would "revisit it before closing arguments when all of the evidence will have been presented."

¶ 12                                  C. Trial

¶ 13                          *1. Plaintiff's Case-in-Chief*

¶ 14        At trial, plaintiff testified that, after the automobile accident, she was taken to the hospital where she was told to take pain medication and follow up with her primary care physician. Plaintiff visited Dr. Satinder Dalawari a week after the accident on August 4, 2008. Dr. Dalawari noted that plaintiff had had neck pain, low back pain, and some burns on her forearm. Plaintiff testified that she had never experienced back or neck pain before the automobile collision. Dr. Dalawari prescribed plaintiff an antibiotic and also ordered a computerized tomography (CT) scan of her cervical spine and lumbar spine. The CT scans showed "mild degenerative dis[c]

disease or dis[c] changes" at the C5-C6 level, but there was no evidence of any fracture or dislocation. Dr. Dalawari recommended that plaintiff see an orthopedic doctor.

¶ 15        Plaintiff visited Dr. Lim, an orthopedic surgeon, on August 13, 2008. Dr. Lim noted that plaintiff had neck pain and low back pain and diagnosed her with cervical strain and lumbar strain. Dr. Lim recommended non-operative treatment including physical therapy. Dr. Lim met with plaintiff again on September 26, 2008. Plaintiff reported that her pain had improved, but had not dissipated. Dr. Lim noted that she was "hyperreflexive," which could indicate that something was "going on" with her nervous system. He recommended that she get an MRI. Upon review of her MRI, Dr. Lim observed impingement at the C5-C6 disc level of her cervical spine.

¶ 16        On October 30, 2008, plaintiff visited Dr. Nulman for an epidural steroid injection to her cervical spine. Dr. Lim testified that after the injection, plaintiff was making improvement, but that her improvement was "rather slow." Plaintiff testified that the procedure of receiving the epidural injection was very painful. Dr. Lim saw plaintiff again on December 12, 2008, and he noted that she had improved and that the epidural "helped her out significantly." Dr. Lim recommended that she finish her physical therapy and follow up with him on an as-needed basis. Plaintiff completed physical therapy on January 7, 2009. Plaintiff testified that at this point in her treatment she felt relief, but was not "100 percent" and that the pain was still present. At the recommendation of her physical therapist, she continued to do physical therapy exercises at home to manage her pain.

¶ 17        Plaintiff returned to Dr. Lim's office on February 20, 2009, and reported that she was doing well until recently, when her symptoms returned. She reported that the pain in her neck was "intolerable" and that she would occasionally experience shooting pain down her right arm.

Dr. Lim recommended that she have a new MRI taken. Plaintiff received a second epidural injection in her cervical spine on March 10, 2009. She told Dr. Lim on March 25, 2009, that after this second injection, she was "about 80 percent better," but was still taking medication to manage her pain. Plaintiff testified that the relief from her second epidural injection lasted about four to five months. Plaintiff did not see any doctors from April 13, 2009, until August 28, 2009.

¶ 18     Plaintiff returned to see Dr. Lim on August 28, 2009, and reported that her pain had returned. She reported that it was identical to the pain she had been experiencing before in her neck and going down her shoulder and arm. Dr. Lim testified that the fact that plaintiff's pain returned meant that there was still a problem causing her symptoms and that the epidural injections were providing her only temporary relief by helping relieve her pain symptoms. On September 23, 2009, plaintiff returned to Dr. Lim's office because she had experienced several episodes of pain shooting down her right leg into her foot. Dr. Lim recommended that that plaintiff get a new MRI.

¶ 19     On September 24, 2009, plaintiff received another epidural injection to her cervical spine, and on September 28, plaintiff had an MRI taken of her lumbar spine. Plaintiff visited Dr. Lim again on October 9, 2009, and reported no improvement in her condition and that the most recent epidural injection had provided her "no relief whatsoever." Dr. Lim discussed plaintiff's surgery options with her and told her that the surgery had an 80% success rate. Plaintiff next met with Dr. Lim on January 8, 2010, and reported that her symptoms were progressive and that she was having more weakness and more problems. Dr. Lim ordered a new MRI for plaintiff and again discussed surgical options with her.

¶ 20     Plaintiff had an MRI on February 1, 2010, and met with Dr. Robinson, a pain management doctor on February 22, 2010. On March 9, 2010, Dr. Robinson recommended that

plaintiff get more injections to her cervical spine and go through another course of physical therapy. Plaintiff completed the physical therapy in March and April of 2010, which she stated helped reduce the frequency and severity of her pain. Dr. Robinson gave plaintiff an epidural injection in her cervical spine on July 19, 2010, which plaintiff told Dr. Robinson on August 3, 2010, gave her "80 percent improvement." Plaintiff did not visit with any doctors between August 3, 2010, and June 15, 2011. Plaintiff reported that during that time, the severity of her pain was reduced and she was able to perform household activities, but was still taking prescription medication to manage her pain.

¶ 21    Plaintiff returned to see Dr. Robinson on June 15, 2011, and reported that she was doing well until December 2010, when her pain started to return. Dr. Robinson recommended that plaintiff get a facet injection, which she reported gave her about "75 percent relief" when she saw Dr. Robinson again on August 10, 2011. Plaintiff met with Dr. Robinson a few more times that year for further pain management treatment. In November 2011, plaintiff got another MRI of her cervical spine.

¶ 22    Plaintiff returned to Dr. Lim's office on April 3, 2012, and reported that she continued to by symptomatic with respect to her cervical spine. Dr. Lim conducted a physical examination of plaintiff and noted that she had a positive Spurling's test (irritation upon the nerve) on both sides of her neck. Dr. Lim also noted that plaintiff had weakness in her left wrist that was "most likely" related to the nerve problem in her neck. Dr. Lim reviewed plaintiff's MRI from November 2011, and observed a herniated disc at the C5-C6 level. Dr. Lim again discussed plaintiff's surgical options with her. Dr. Lim testified that to a reasonable degree of medical certainty, all of the treatment and other procedures plaintiff underwent up to this point in her

treatment were reasonably necessary and related to the automobile collision that occurred on July 28, 2008.

¶ 23    On cross-examination, defense counsel asked Dr. Lim whether the herniated disc shown in plaintiff's November 2011 MRI was caused by the automobile accident. Dr. Lim responded that he could not say with 100% certainty that the herniated disc was caused by the accident, but added that:

> "You can damage the dis[c]. [The d]is[c] has very little capability to heal and if patients remain symptomatic, typically the dis[c] is damaged and then eventually it's going to rupture. So the fact that [the herniated disc may not have been present in plaintiff's earlier MRIs] doesn't necessarily rule out the fact that it wasn't caused by the motor vehicle accident. But on the other side of the coin, I can't say a hundred percent that it was, without question, related to the motor vehicle accident."

Defense counsel clarified that Dr. Lim did not "have an opinion one way or the other" whether plaintiff's herniated disc was caused by the automobile collision, and Dr. Lim confirmed that he could not "give [] an opinion based on a reasonable degree of medical and orthopedic certainty."

¶ 24    On redirect examination, Dr. Lim testified that the trauma caused by the automobile accident in this case was sufficient to damage the disc to the level represented in plaintiff's November 2011 MRI. Dr. Lim explained that once the disc is damaged, it does not heal and that the degenerative condition may worsen and become accelerated. Plaintiff's counsel then asked Dr. Lim whether plaintiff's herniated disc was related to the automobile collision.

> "Q. Okay. Do you know if it's more probably true or not whether the automobile collision that we're talking about here—whether it's more probably true or not that that played a causative role in the herniated dis[c]?
>
> ***

A. It's my belief, based on a reasonable degree of medical and orthopedic certainty, that she—this patient probably had some pre-existing degenerative changes that were aggravated by the motor vehicle accident.

Q. Okay. And that motor vehicle accident then led—did it lead—did it lead initially to then—I think there was a bulging dis[c] or a dis[c] osteophyte *** initially?

A. Well, like I said, I think that's probably pre-existing degenerative conditions but then the accident unmasked it and she became symptomatic.

Q. Okay. So it was there but is—is it your opinion then it was there but not symptomatic and then the auto collision made it symptomatic?

A. Correct.

Q. And then that went ahead and progressed over time?

A. Correct.

Q. Leading to this herniated dis[c]?

A. Correct.

***

Q. Did it lead to this herniated dis[c] condition?

A. I believe so."

On recross-examination, Dr. Lim reiterated that he could not say with 100% certainty one way or the other whether the herniated disc shown in plaintiff's November 2011 MRI was or was not caused by the automobile accident.

¶ 25    On June 11, 2012, plaintiff met with Dr. Malek, a neurosurgeon. Dr. Malek testified that his impression was that plaintiff had "persistent cervical radiculopathy clinically in mid- to lower cervical distribution that has failed the passage of time, activity restriction, medication, and extensive pain management." Dr. Malek explained that "cervical" refers to the neck and that "radiculopathy" is an affliction of the nerves exiting the neck and going down the arm.

¶ 26    Plaintiff returned to see Dr. Malek on August 29, 2012, and he reviewed her MRIs from June 19, 2012, and February 1, 2010. Dr. Malek testified that the MRIs showed there was a disc herniation at the C5-C6 level. Dr. Malek further testified that the MRIs showed "background degenerative changes" that were seen in any person of plaintiff's age and were incidental. Dr.

Malek also testified that the MRIs and other tests showed that plaintiff's complaints were consistent with what the testing showed and her response to treatment.

¶ 27　　　Plaintiff visited Dr. Malek again on November 7, 2012, and they discussed her treatment options. Dr. Malek informed plaintiff that she had two options regarding her treatment: she could either have surgery or live with the symptoms. Dr. Malek explained that the surgery would consist of fusing the discs at the C5-C6 level which would limit plaintiff's movement in exchange for improvement in her pain. Dr. Malek told plaintiff that the surgery was successful 90 percent of the time, but that the benefit of the surgery would be decreased the further the date of the surgery was from the incident because of chemical changes in the body over time. Dr. Malek also informed plaintiff of the inherent risks of surgery, such as infection, lack of improvement, need for further surgery in the future, and death.

¶ 28　　　Plaintiff testified that she did not elect to have the surgery because there was no guarantee of success and because of the risks involved with the surgery. Plaintiff saw Dr. Malek again in July 2013, but did not see any doctors until she visited Dr. Malek's office for the last time on March 5, 2014. Dr. Malek testified that throughout his treatment of plaintiff and in reviewing her medical records from her other physicians, her symptoms have been "consistent punctuated by periods of improvement of various lengths related to treatment such as epidural injection[s] that helped her temporarily. But her symptoms have been consistent from beginning to end." Dr. Malek testified that the symptoms he treated plaintiff for were related to the automobile accident on July 28, 2008, because the accident made the natural degenerative process in her spine, which likely would have been asymptomatic throughout her life, symptomatic. Dr. Malek explained that he based this opinion on the fact that the emergence of her symptoms was contemporaneous with the automobile collision and the findings on the

physical examination were consistent with that diagnosis. He also explained that plaintiff's response to treatment gave her a high degree of credibility with respect to her reported pain symptoms.

¶ 29    Finally, Dr. Malek testified with regard to whether plaintiff's symptoms were permanent, that she had reached "maximum medical improvement" (MMI). He explained that "she is unlikely to change for the better or for the worse" without surgical intervention. Dr. Malek further testified that to a reasonable degree of medical and neurological certainty, that plaintiff's symptoms will interfere with her daily living and normal life and that "with or without surgery, there's a permanency to her condition" because without surgery she will continue to experience pain and that surgery, even if completely successful, would limit her mobility.

¶ 30    On cross-examination, Dr. Malek stated that degenerative changes in the spine can happen regardless of trauma, but in his experience degenerative changes usually become symptomatic after a triggering event. Dr. Malek explained that when a person has degenerative changes, it predisposes the person to injury, and there is more often than not a triggering event that results in the onset of symptoms. He qualified his statement by saying that it is possible for a person to develop pain purely from degenerative changes. Dr. Malek also stated that plaintiff's MRI from June 19, 2012, showed a "dis[c] herniation abutting the spinal cord." Dr. Malek explained that on the report accompanying the MRI, the radiologist described the issue with plaintiff's disc as a "protrusion," which Dr. Malek explained is a synonym for a herniated disc.

¶ 31    At the time of trial, plaintiff was seeing Dr. Goran Tubic for pain management. Plaintiff testified that Dr. Tubic administered "cold high radiofrequency ablation injection[s,]" which she testified helped with her pain, but did not eliminate it. Plaintiff further testified that she was taking prescription medication and testified to her monthly costs for that medication over

defendant's objection. Plaintiff testified that she was taking Zorvolex, which costs her $341 each month, Nucynta, which costs her $565 each month, and Lyrica, which costs her $365 or $375 each month. Finally, plaintiff testified that she still has trouble performing daily household tasks because of her pain and that the pain interferes with her sleep.

¶ 32    Plaintiff stated that she did not plan on having the surgery and that she is able to function at work and perform household chores, although with some difficulty. Plaintiff testified that as a home health nurse, she is not required to perform heavy lifting at work, although she sometimes has to move patients in their beds. She testified that she is able to work three or four days a week, six to eight hours a day.

¶ 33    *2. Defendant's Case-in-Chief*

¶ 34    Defendant presented the testimony of Dr. Avi Bernstein. Dr. Bernstein testified that in preparation for his testimony, he reviewed Dr. Lim's notes regarding plaintiff's treatment and all of plaintiff's MRIs. He also conducted a physical examination of plaintiff. He testified that, in his medical opinion, plaintiff suffered an injury from the vehicle collision and then found relief. He further testified that when plaintiff visited Dr. Lim in August of 2009, after four months of not seeking treatment, the symptoms that she was experiencing were not causally related to the automobile collision. Dr. Bernstein believed that plaintiff suffered sprains as a result of the accident, and that her pain was an aggravation of those sprains, but that her symptoms from the accident lasted only eight months, through March 2009. Dr. Bernstein testified that after the initial eight months of treatment, her condition became stable and any further treatment was not causally related to the automobile collision.

¶ 35    Dr. Bernstein examined plaintiff in May 2013. He noted that her neck exam was "normal" and he did not think she was a candidate for surgery. Dr. Bernstein did not agree with

Dr. Malek's opinion that plaintiff's injuries were ongoing and permanent because of the gaps in her treatment. Because of these gaps in her treatment, Dr. Bernstein testified that the pain plaintiff experienced in June 2011 could not be tied to the automobile collision. He believed that this pain was instead "just a reflection of the fact of a degenerative dis[c]."

¶ 36    On cross-examination, Dr. Bernstein acknowledged that the pain plaintiff is having now and throughout her treatment is the same pain she was complaining of immediately following the collision. Dr. Bernstein also acknowledged that the pain could limit her throughout her life. Dr. Bernstein stated that 70% of his work has been testifying for the defense in cases similar to the one at bar. Following the conclusion of the testimony, the parties stipulated that plaintiff incurred $95,548.04 in medical expenses, but defendant admitted that only $35,851.11 of those expenses, incurred through March 25, 2009, were reasonable, necessary, and related to the automobile collision.

¶ 37    *3. Defendant's Motion in Limine 16*

¶ 38    Before closing argument, the court held a hearing on defendant's motion *in limine* 16. At the hearing, defendant asserted that plaintiff failed to specify a dollar amount for the future medical expenses she was seeking in her Rule 213(f) disclosures. Defendant further contended that there was insufficient testimony to support the future cost of her prescription medication because no physicians testified regarding the amount of any future costs and there was no testimony regarding how long plaintiff would need to take any prescription medication and in what amounts. In denying defendant's motion, the court noted that Illinois case law provided that expert testimony was not necessary if it was reasonable that the future expenses would be incurred. The court also observed that plaintiff properly disclosed her claim for future medical expenses through her disclosures that Dr. Malek would testify that plaintiff's condition was

permanent. The court noted, however, that it was necessary to give the jury some parameters to calculate the amount of the award and noted that it had previously granted plaintiff's motion *in limine* 22, which reflected a mortality table showing plaintiff's life expectancy of 38.7 more years. The court then denied defendant's motion *in limine* 16.

¶ 39                                 D. Verdict and Postjudgment Proceedings

¶ 40          Following closing argument, the jury returned a verdict in plaintiff's favor in the amount of $1,301,048.04. The itemized breakdown of that amount showed that the jury awarded plaintiff $107,500 for the loss of normal life experienced; $310,250 for the loss of normal life reasonably certain to be experienced in the future; $107,500 for pain and suffering experienced; $310,250 for pain and suffering reasonably certain to be experienced in the future; $95,549.04 for the reasonable expense of necessary medical care, treatment, and services received; and $370,000 for the reasonable expenses of medical care, treatment, and services reasonably certain to be received in the future. On June 10, 2015, the trial court entered a judgment on the verdict.

¶ 41          Defendant subsequently filed a posttrial motion, seeking a new trial or remittitur of the jury's verdict. Defendant contended, *inter alia*, that the trial court erred in overruling her objection to Dr. Lim's opinion that the automobile collision caused plaintiff's herniated disc, that the court erred in denying defendant's motion *in limine* 16, and that the court erred in overruling defendant's objection to Dr. Malek's testimony that plaintiff would suffer loss of normal life in the future because he had not examined plaintiff for 15 months before giving his evidence deposition. After a hearing, the trial court denied defendant's motion in a written order.

¶ 42          In its order, the court found that Dr. Malek's opinion regarding the permanency of plaintiff's condition was admissible, given the totality of the circumstances, and that recency of the last examination was only one factor the court could consider. The court further found that

plaintiff properly disclosed in her Rule 213(f) disclosures that Dr. Lim would testify that her herniated disc was caused by the automobile accident. The court also found that it did not err in denying defendant's motion *in limine* 16 because the evidence was sufficient to support a claim for future medical expenses and the amount awarded was reasonable under the circumstances. Finally, the court found that the jury's verdict was not against the manifest weight of the evidence and that defendant was not entitled to a new trial or remittitur. This appeal follows.

¶ 43                                    II. ANALYSIS

¶ 44        On appeal, defendant repeats many of the same arguments contained in her motion for a new trial. Specifically, defendant contends that the trial court erred in overruling her objection to Dr. Lim's opinion that the automobile collision caused plaintiff's herniated disc, that the trial court erred in denying defendant's motions *in limine* 15 and 16, and that the jury verdict was contrary to the manifest weight of the evidence and should be vacated for a new trial or remittitur. In support of these arguments, defendant asserts that the record shows that only the first eight months of plaintiff's treatment were reasonably related to the automobile collision and that any changes in her condition after that eight-month period were the result of natural degenerative changes in her cervical spine. Plaintiff responds that Dr. Lim's opinion regarding the herniated disc was properly disclosed and admitted by the trial court, that the court did not err in denying defendant's motions *in limine* 15 and 16 where Dr. Malek properly testified that plaintiff's condition was permanent, and that plaintiff's testimony properly established the cost of her future medical expenses for pain medication. Plaintiff also contends that that the record shows that all of plaintiff's pain and symptoms are related to the automobile collision, that the jury's verdict was reasonable and not excessive, and that defendant is not entitled to a new trial or remittitur.

¶ 45                                    A. Standard of Review

¶ 46          Defendant initially contends that she is entitled to a new trial where the jury's verdict was the product of trial errors that unduly affected the outcome of the trial. She maintains that the trial court erred in denying her motion for a new trial where these errors deprived her of a fair trial. We review the trial court's denial of a motion for a new trial for abuse of discretion. *Redmond v. Socha*, 216 Ill. 2d 622, 651 (2005).

¶ 47                        *1. Dr. Lim's Testimony Regarding the Herniated Disc*

¶ 48          Defendant first contends that the trial court erred in overruling her objection to Dr. Lim's "new opinion" on redirect examination that the automobile accident led to plaintiff's herniated disc. Defendant maintains that in Dr. Lim's evidence deposition on September 27, 2011, he did not testify that the automobile accident caused plaintiff's herniated disc. Defendant further contends that plaintiff's Rule 213(f) disclosures were filed on February 25, 2011, before the MRI showing the herniated disc was taken, and before Dr. Lim's evidence deposition. Defendant recognizes that after Dr. Lim's evidence deposition, plaintiff provided additional medical records, including the November 2011 MRI that showed the herniated disc, but defendant asserts that these supplemental disclosures did not provide sufficient notice that Dr. Lim would testify that in his opinion the automobile accident led to the herniated disc. Plaintiff responds that Dr. Lim's opinion was properly disclosed in the August 2012 supplemental response to interrogatories, which included the November 2011 MRI and a record which showed that Dr. Lim had reviewed the MRI and observed that plaintiff continued to be symptomatic with respect to her cervical spine.

¶ 49                                    a. Illinois Supreme Court Rule 213

¶ 50          Illinois Supreme Court Rule 213(f) provides that, upon written interrogatory, the party must identify the subjects on which an independent expert witness "will testify and the opinions the party expects to elicit." Ill. S. Ct. R. 213(f)(2) (eff. Jan. 1, 2007). The rule further provides that a party "has a duty to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party." Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2007). One of the purposes of Rule 213 is to avoid surprise. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004). Although an expert witness is not permitted to testify to opinions and conclusions not previously disclosed, the expert's trial testimony does not necessarily violate Rule 213 if it is "an elaboration on, or a logical corollary to, the original revealed opinion." *Spaetzel v. Dillon*, 393 Ill. App. 3d 806, 813 (2009) (citing *Brax v. Kennedy*, 363 Ill. App. 3d 343, 355 (2005)). "The admission of evidence pursuant to Rule 213 is within the sound discretion of the trial court, and the court's ruling will not be disturbed absent an abuse of that discretion." *Sullivan*, 209 Ill. 2d at 109 (citing *Susnis v. Radfar*, 317 Ill. App. 3d 817, 828 (2000)).

¶ 51                                    b. Plaintiff's Rule 213 Disclosures

¶ 52          In this case, plaintiff filed her initial Rule 213(f) answers to interrogatories on February 25, 2011. In those answers, plaintiff identified Dr. Lim as one of plaintiff's treating physicians who may be called to testify at trial. The answers further provided that Dr. Lim would testify "that said injuries and symptoms identified in the medical records are caused by the accident" and that "[p]laintiff's condition may deteriorate with age or treatment." The answers further disclosed that Dr. Lim would "rely upon the radiographic studies contained in the medical

records." Finally, plaintiff disclosed that she would "be seeing [Dr. Lim] again before trial either for treatment or to update the doctor's opinion."

¶ 53     In November 2011, plaintiff had an MRI, which showed a herniated disc in her cervical spine. On August 7, 2012, plaintiff filed a supplement to the interrogatory answers filed on February 25, 2011. In her supplemental answers, plaintiff disclosed that based upon Dr. Lim's recent examination, plaintiff expected Dr. Lim to testify that she required future and further medical treatment to treat her pain and problems related to the automobile collision. Plaintiff further disclosed that Dr. Lim "is expected to rely on any and all other medical records of the plaintiff from other doctors and hospitals." Under Dr. Lim's name on the disclosures is a notation to "See attached records." Attached to the supplemental answers, plaintiff included a medical record from April 2, 2012. The record provides that plaintiff "continues to be symptomatic with respect to the cervical spine" and that plaintiff's "MR scan was reviewed from November 2011 and shows herniated disc at C5-6. The patient was examined with Dr. Lim and he reviewed these studies." Plaintiff also included a copy of the MRI scan from November 2011.

¶ 54                          c. Dr. Lim's Trial Testimony

¶ 55     At trial, Dr. Lim was questioned extensively regarding any link between the automobile collision and the disc herniation. On cross-examination, Dr. Lim stated that he could not say with 100 percent certainty that the disc herniation was related to the automobile collision. On redirect examination, Dr. Lim testified that plaintiff had some preexisting degenerative changes in her cervical spine that were aggravated by the automobile collision. Dr. Lim further testified that over time, this progressed into the herniated disc revealed in the November 2011 MRI. This is entirely consistent with the information disclosed by plaintiff in her initial Rule 213(f) disclosures and the supplemental answers.

¶ 56           In her initial answers to interrogatories, plaintiff disclosed that Dr. Lim would testify that the injuries and symptoms identified in the medical records were caused by the automobile collision and that she would return to see Dr. Lim to update his opinion. In the supplemental disclosures, plaintiff included attachments showing that she had returned to see Dr. Lim and he had reviewed the November 2011 MRI revealing the herniated disc. She further disclosed that Dr. Lim would testify that plaintiff continued to need treatment for the injuries related to the automobile collision. Although plaintiff did not specifically state in her disclosures that Dr. Lim will testify that plaintiff's herniated disc was caused by the automobile collision, an expert's trial testimony does not necessarily violate Rule 213 if it is "an elaboration on, or a logical corollary to, the originally revealed opinion." *Spaetzel*, 393 Ill. App. 3d at 813.

¶ 57           Here, it is a logical corollary that Dr. Lim would testify that plaintiff's herniated disc was caused by the automobile collision where plaintiff disclosed Dr. Lim's opinion that the injuries and symptoms contained in the medical record were caused by the automobile collision and supplemented that disclosure with the November 2011 MRI and the medical record showing that Dr. Lim had reviewed the MRI and noted that plaintiff continued to be symptomatic with respect to her cervical spine. Defendant points out that Dr. Lim did not reveal this opinion in his evidence deposition on September 27, 2011; however, defendant concedes that this deposition took place before plaintiff's November 2011 MRI, which first revealed the herniated disc. Although the herniated disc did not appear in any of plaintiff's earlier MRIs, Dr. Lim testified that it was related to the automobile collision because the collision caused the degenerative condition in her cervical spine to become symptomatic and progress over time leading to the disc herniation. Accordingly, we find that Dr. Lim's testimony was consistent with the disclosures contained in plaintiff's Rule 213(f) answers to interrogatories and the disclosures in the

supplemental answer, and we cannot say that the trial court abused its discretion in admitting this evidence. *Sullivan*, 209 Ill. 2d at 109.

¶ 58                              *2. Defendant's Motion in Limine 15*

¶ 59        Defendant next contends that the trial court erred in denying her motion *in limine* 15 and overruling her objections to Dr. Malek's opinion that plaintiff's condition was permanent. Defendant maintains that Dr. Malek's opinions regarding plaintiff's future medical treatment were speculative and lacked foundation because she visited him only six times over a two-year period and her last visit was more than 15 months before Dr. Malek's evidence deposition on June 18, 2015. Plaintiff responds that the recency of the last examination is only one factor the court should consider in determining whether to permit this type evidence and that other factors weighed in favor of denying defendant's motion and overruling her objections.

¶ 60                              a. Standard of Review

¶ 61        A trial court's ruling on a motion *in limine* addressing the admission of evidence will not be disturbed on review absent a clear abuse of discretion. *Ahmed v. Pickwick Place Owners' Ass'n*, 385 Ill. App. 3d 874, 891 (2008) (citing *Swick v. Liautaud*, 169 Ill. 2d 504, 520-21 (1996)). An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the same view. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 62                              b. The *Decker* Standard

¶ 63        As the parties and the trial court recognized, in determining whether to admit a doctor's testimony regarding future damages or prognosis, the trial court should apply the standard developed by the supreme court in *Decker v. Libell*, 193 Ill. 2d 250 (2000). In *Decker*, the supreme court identified the factors the trial court should consider in determining the

admissibility of opinion testimony about the prognosis for a patient's condition: "the nature of the plaintiff's injury or condition, the type of treatment administered to the plaintiff, the length of time the plaintiff was receiving the treatment, the number and frequency of the plaintiff's visits, the length of time between the plaintiff's last treatment and the witness' formation of his or her opinion, the length of time between the formation of the opinion and the trial, and any other circumstances that bear on the relevance and reliability of the proposed testimony." *Id.* at 254. The court should first determine whether the evidence is admissible, and then, if it is, permit the trier of fact to determine what weight to assign to it. *Id.* at 253-54.

¶ 64 In this case, the trial court held several hearings on defendant's motion *in limine* 15. Ultimately, the trial court recognized that, under the *Decker* standard, the recency of the exam was only one factor the court should consider in determining whether to permit admission of the evidence. The court also recognized that the only issue for the court was to determine whether the prognosis evidence was admissible and that it was the responsibility of the jury to determine the weight to give the evidence once admitted.

¶ 65 In his evidence deposition and at trial, Dr. Malek testified that plaintiff had reached MMI (maximum medical improvement), and that her condition was unlikely to change absent surgical intervention. He also noted that the longer plaintiff waited to get the surgery, the less relief she would realize, but also informed plaintiff that, although the surgery had a 90% success rate, it carried inherent risks. Through Dr. Malek's treatment of plaintiff, he noted that she had periods of improvement brought about by her epidural injections, but concluded that plaintiff's pain and symptoms would not be completely resolved without surgery. Even with surgery, Dr. Malek testified that her condition was permanent because the surgery would cause her to lose mobility.

¶ 66        As the trial court recognized in denying defendant's posttrial motion, Dr. Malek had not seen the patient for 14 months before his evidence deposition and for 39 months before trial. Dr. Malek also saw plaintiff only six times during a two-year period. The court considered these factors in ruling on defendant's motion, but noted that "it's the totality of the circumstances, that's the standard the Court is to apply. And the length of time is not determinative, but one of the factors that the Court should consider." The court also recognized, in line with the reasoning in *Decker*, that its ruling merely bore on the admissibility of the evidence, and the jury, as the trier of fact, was charged with determining the weight to give the testimony, and could consider the recency and frequency of the examinations in assigning that weight.

¶ 67        Defendant nonetheless contends that Dr. Malek's opinions were lacking in foundation and speculative because plaintiff's conditions and symptoms varied over time. Defendant asserts that the record shows that plaintiff had three significant gaps[1] in treatment belying Dr. Malek's opinion that plaintiff's condition was permanent. Contrary to defendant's claim, however, the record shows that although plaintiff did not seek medical treatment during these "gaps," she was taking her prescribed medication. More importantly, the record shows that plaintiff received epidural injections before two of these "gaps," which both Dr. Malek and Dr. Lim recognized provided plaintiff with temporary relief from her pain symptoms, but did not eliminate her symptoms or her condition. Both Dr. Lim and Dr. Malek testified that the symptoms plaintiff was experiencing throughout her treatment were related to automobile collision. Ultimately, as the trial court recognized in ruling on defendant's motion, the question was one of admissibility of Dr. Malek's testimony. We believe the court correctly applied the *Decker* factors in determining that the evidence was admissible. The factors defendant identifies—such as the

---

[1]The three significant gaps identified by defendant are between March 25, 2009, and August 28, 2009; August 2010 and June 2011; and July 31, 2013, and March 5, 2014.

recency of the examination, the frequency of her visits, and the gaps in treatment—were factors that the jury could consider in determining the weight to assign to Dr. Malek's testimony regarding the permanency of plaintiff's condition. See *Decker*, 193 Ill. 2d at 253-54. Accordingly, we find that the trial court did not abuse its discretion in denying defendant's motion *in limine* 15.

¶ 68                                    *3. Defendant's Motion in Limine 16*

¶ 69          Defendant next contends that the trial court erred in denying her motion *in limine* 16 to the extent that plaintiff was allowed to testify to the previously undisclosed cost of her pain medication. Defendant maintains that plaintiff failed to disclose in her Rule 213 disclosures that she would be seeking a claim for future medical expenses and that there was no expert witness testimony regarding the prescription medication plaintiff would need in the future. Plaintiff responds that the jury heard from Dr. Lim and Dr. Malek that, absent surgery, which plaintiff testified she was not planning to have, plaintiff's pain was unlikely to be eliminated. Plaintiff therefore contends that the jury could infer from this testimony that plaintiff would being taking the prescription pain medication for the remainder of her life, the duration of which (38.7 more years) was delineated in the mortality table in plaintiff's motion *in limine* 22, and the award amount adequately reflects the jury's consideration of that evidence. Defendant replies that award was the product of speculation because there was no medical testimony regarding the cost of plaintiff's future medication.

¶ 70          In support of her contention, defendant relies on *Briante v. Link*, where this court ordered remittitur of an award for future medical expenses. *Briante v. Link*, 184 Ill. App. 3d 812 (1989). In *Briante*, the plaintiff submitted evidence that his past medical bills were $15,763.80 and that he would incur an additional expense of $6000 for future medical expenses, for a total of

$21,763.80. *Id.* at 814. The jury's itemized verdict showed that it awarded the plaintiff $56,000 for past and future medical expenses, $34,236.20 more than the expenses the plaintiff established. *Id.* On appeal, the plaintiff attempted to justify this excess award amount by contending that it represented the cost of future physical therapy. *Id.* This court rejected that theory, however, noting that there was no evidence in the record of a specific medical recommendation of a type of therapy and the cost and duration of any physical therapy. *Id.* Accordingly, the court reduced the amount of the award for past and future medical expenses to $21,763.80, the amount established at trial. *Id.*

¶ 71        In contrast to *Briante*, the plaintiff in this case testified that the cost of her prescription medications was between $1270 and $1280 per month.[2] Expert testimony was not necessary to establish the dollar amount of future medical expenses. *Rainey v. City of Salem*, 209 Ill. App. 3d 898, 907 (1991)[3]; see also *Levin v. Welsh Brothers Motor Service, Inc.*, 164 Ill. App. 3d 640, 659 (1987). Dr. Malek testified that plaintiff had reached MMI and her condition was unlikely to change one way or the other, absent surgery. Plaintiff testified that she did not plan to have surgery. Based on this evidence, a reasonable person could conclude that plaintiff would continue to incur the costs associated with her prescription medication. *Rainey*, 209 Ill. App. 3d at 907 ("Evidence that future medical expenses will be incurred can be inferred from the nature of the disability. If the elements of damage presented for the jury's consideration are proper under the facts of the case, then the assessment of damages is preeminently for the jury, even though reasonable persons could differ as the amount.")

---

[2]$341 for Zorvolex, $565 for Nucynta, and $365 or $375 for Lyrica.
[3]The fifth district recently reaffirmed its ruling in *Rainey* in *Bruntjen v. Bethalto Pizza, LLC*, 2014 IL App (5th) 120245.

¶ 72        Moreover, contrary to defendant's contention, the jury did not need to speculate as to the amount of damages to award given plaintiff's testimony regarding the cost of her medication and the mortality table which reflected a life expectancy of 38.7 more years. Given the evidence that plaintiff's medical expenses in the seven years between the automobile accident and the trial were $95,548.04, that plaintiff's life expectancy was 37.8 years, and that plaintiff's symptoms would not be eliminated without surgery, an award of $375,000 for future medical expenses was supported by the evidence. See *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 47 (2009) ("Given that his past medical bills were $132,000 for the 6 years between his accident and the trial in this case and that his life expectancy was 21 years, an award of $201,000 for future medical expenses was supported by the evidence.").

¶ 73                                    B. Manifest Weight of the Evidence or Remittitur

¶ 74        Defendant finally contends that the jury's verdict was contrary to the manifest weight of the evidence and asks this court to vacate the judgment for a new trial or remittitur. Defendant asserts that the jury's award for plaintiff's future medical expenses was excessive and based on speculation. Defendant further maintains that the awards for future loss of normal life and future pain and suffering were excessive because the plaintiff testified that she was still able to perform household chores and work a "physically demanding" job. Defendant contends that the "verdict can be explained only if the jury believed that the accident caused the plaintiff's herniated disc and all of her symptoms for the past seven years." Defendant contends that the herniated disc could not have been related to the automobile accident because it did not manifest until three years after the accident.

¶ 75                                    *1. Standard of Review*

¶ 76         A trial court should order a new trial if, after weighing the evidence, the court determines that the jury's verdict is contrary to the manifest weight of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the jury's findings are unreasonable, arbitrary, or not based on the evidence. *Redmond*, 216 Ill. 2d at 651. We review the trial court's denial of defendant's motion for a new trial for abuse of discretion. *Maple*, 151 Ill. 2d at 455. Similarly, we review the trial court's ruling on a motion for a remittitur for abuse of discretion. *Martinez v. Elias*, 397 Ill. App. 3d 460, 474 (2009). "A verdict will not be set aside by a court unless it is so excessive that it indicates that the jury was moved by passion or prejudice or unless it exceeds the necessarily flexible limits of fair and reasonable compensation or is so large that it shocks the judicial conscience." *Kindernay v. Hillsboro Area Hospital*, 366 Ill. App. 3d 559, 572 (2006). The court should not grant a remittitur where the jury's award falls within the flexible range of conclusions reasonably supported by the evidence. *Id.* at 572.

¶ 77                          *2. No Basis for New Trial or Remittitur*

¶ 78         The bases of many of defendant's arguments have been addressed above. Defendant contends that the jury's verdict can be explained only if the jury believed that her herniated disc was caused by the automobile accident. Given that Dr. Lim testified that plaintiff's herniated disc was caused by the accident, it was reasonable for the jury to reach such a conclusion. As discussed above, Dr. Lim's testimony regarding plaintiff's herniated disc was properly disclosed and admitted. Furthermore, we have already addressed the amount of the award for plaintiff's future medical expenses and found it reasonable under the circumstances. For similar reasons, we find no issues with the jury's award amounts for plaintiff's future loss of normal life and

future pain and suffering. Plaintiff testified that although she is able to perform household chores, she does so with difficulty because of the pain symptoms. We cannot say that the amounts awarded exceed "the necessarily flexible limits of fair and reasonable compensation or [are] so large that [they] shock[] the judicial conscience." *Kindernay*, 366 Ill. App. 3d at 572. In sum, there was evidentiary support for the jury's verdict and the award amount, and we cannot say that the trial court abused its discretion in denying defendant's motion for a new trial or remittitur.

¶ 79                                    III. CONCLUSION

¶ 80        For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 81        Affirmed.