2026 IL App (1st) 250361-U

No. 1-25-0361

Order filed April 14, 2026

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| LISA COSENTINO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 L 2417 |
| | ) | |
| MARILYN VILORIA, | ) | Honorable |
| | ) | Preston Jones, Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices Ellis and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the jury's damages awards for pain and suffering and loss of a normal life over defendant's contention that the trial court should have granted remittitur or a new trial.

¶ 2    This negligence lawsuit arises out of an automobile collision in which defendant Marilyn Viloria's vehicle struck the rear of plaintiff Lisa Cosentino's vehicle. Defendant admitted negligence and, following trial, a jury awarded plaintiff $2,562,417.92 in damages, consisting of $1,614,808.96 for pain and suffering, $885,000 for loss of a normal life, and $62,608.96 in

stipulated medical expenses. On appeal, defendant contends that the trial court should have granted remittitur or a new trial. For the following reasons, we affirm.

¶ 3                                 I. BACKGROUND

¶ 4                                 A. Pleadings

¶ 5       Plaintiff's complaint alleged that on March 31, 2021, she "was parked in her motor vehicle with her [left] arm extended out of her driver's side window using a drive-through ATM" at a bank in Niles. Defendant's vehicle struck the rear of plaintiff's vehicle. The impact bent plaintiff's "arm backwards into an unnatural position internally deranging her shoulder anatomy which necessitated surgical repair." Plaintiff alleged that defendant's negligent operation of her vehicle proximately caused plaintiff to suffer economic and non-economic damages in excess of $50,000.

¶ 6       Defendant's amended answer admitted negligence but disputed "exactly what economic or non-economic losses the plaintiff has suffered."

¶ 7                                 B. Trial

¶ 8       The case proceeded to a damages-only jury trial that began on September 25, 2024.

¶ 9       The record on appeal does not contain reports of proceedings or a bystander's report for the first day of trial. From the common law record, we can glean that on September 25, 2024, the court issued pretrial rulings on motions *in limine* and stipulations. The court also ruled on designations and objections to the evidence depositions of plaintiff's treater Dr. Kevin Tu, plaintiff's sister Toni Cosentino, and defense expert Dr. Klaud Miller. However, we do not know the substance of these rulings. The court's pretrial order of September 25, 2024, says only that "[t]he court ruled on objections in the video depositions of Dr. Tu, Dr. Miller and Toni Consentino *** by marking the transcript." Additionally, the record does not include the parties' opening

statements or any of the exhibits introduced as evidence at trial. We address these omissions from the record below.

¶ 10                                     1. Plaintiff

¶ 11     Plaintiff testified that on March 31, 2021, she drove up to the ATM, parked her vehicle, unfastened her seatbelt, and reached her left arm out of her vehicle's window to make a transaction. During the transaction, plaintiff felt like she was "hit by a freight train." The accident pushed plaintiff's vehicle approximately 30 feet forward even though it was in park. Plaintiff "went flying forward," her head struck the rearview mirror and windshield, and her knee struck the dashboard. Plaintiff's "arm felt like it was broken in 30 places" and her "elbow was really bad." Plaintiff initially exited her vehicle but became dizzy and felt head pain, so she returned to her vehicle.

¶ 12     An ambulance transported plaintiff to Lutheran General Hospital's emergency room at approximately 4:30 p.m. Treaters determined that plaintiff suffered no broken bones and did not require surgery. The hospital discharged plaintiff at approximately 1:00 a.m. and her sister Toni took her home. That night, plaintiff "couldn't move [her] arm" and felt pain in her left arm, neck, and knee. Her nephew helped her get out of the tub so she could go to bed. The next day, plaintiff's pain "was ten times worse."

¶ 13     Approximately six days later, in early April 2021, plaintiff saw orthopedic surgeon Dr. Mark Sokolowski. He ordered further imaging and physical therapy but determined that surgery was not necessary. Plaintiff began physical therapy at that point.

¶ 14     Approximately a day after seeing Dr. Sokolowski, plaintiff returned to her job managing the All Inn bar, which her father owned. Plaintiff testified that she "had to get back" to work and "had no choice." Her father was 82 years old and "wouldn't even know how" to run the bar because

plaintiff had "been doing it by [her]self for all these years." Plaintiff worked 10 to 12-hour shifts seven days a week. When football season began in September, she sometimes worked 16-hour shifts. Before the accident, plaintiff "d[id] everything" at the bar including managing, accounting, stocking, and janitorial work. After the accident, plaintiff "did a lot of pointing" to direct bar staff because she "couldn't do anything" that required lifting or straightening her left arm.

¶ 15    After 9 to 10 months of physical therapy, plaintiff still could not lift or straighten her left arm or fully turn her neck, so Dr. Sokolowski referred her to Dr. Tu, another orthopedic surgeon. Dr. Tu gave plaintiff an injection that improved her "pinching" left shoulder pain but not her arm's range of motion. Plaintiff's left shoulder pain returned approximately three weeks later. Dr. Tu recommended surgery and plaintiff agreed.

¶ 16    On January 14, 2022, plaintiff underwent outpatient left shoulder surgery at Elmhurst Surgical Center. Following surgery, plaintiff wore an ice sleeve for approximately four to five hours a day for "a couple days." The sleeve "really helped with the pain." Plaintiff took only one "batch" of the pain medication Dr. Tu prescribed because the medication made it difficult for her to function. Approximately a week after surgery, plaintiff felt "great" and could lift and straighten her left arm. Plaintiff returned to work at that point.

¶ 17    Plaintiff completed physical therapy on February 16, 2022, and saw Dr. Tu that day.[1] Dr. Tu extended, rotated, and lifted plaintiff's left arm and "[s]aid everything was good." Plaintiff acknowledged that she told Dr. Tu and physical therapists she was not "in any type of pain" at that point. She meant she was not experiencing any *shoulder* pain but was still experiencing "pressure

---

[1]The witnesses' testimony suggests that plaintiff underwent two rounds of physical therapy: one that Dr. Sokolowski prescribed shortly after the accident, and post-surgery physical therapy that Dr. Tu prescribed, which ended on February 16, 2022.

from the base up" in her neck. Plaintiff testified that her neck pain from the accident never improved.

¶ 18    After February 16, 2022, plaintiff's left shoulder pain "started creeping back in little by little" to the point that she could not lift boxes or mop the bar's floor. Plaintiff was sore while working "[a]ll day, every day." She had to change the way she dressed and struggled to straighten her hair. When taking care of her father, plaintiff struggled with physical tasks such as carrying groceries and laundry up and down stairs. Plaintiff also gained weight because she could not exercise. Plaintiff testified that she was "not the same" and was "a little bit depressed" but felt that "life goes on."

¶ 19    On November 15, 2023, plaintiff saw Dr. Tu again because she "had a constant feeling like somebody was grabbing and pinching [her] shoulder." She could raise her left arm only partially before it became painful. Dr. Tu gave plaintiff's left shoulder several injections, which improved her symptoms after a few days but made her shoulder sore.

¶ 20    On June 13, 2024, plaintiff saw Dr. Sokolowski because she "was getting a pinching pain in [her] neck," which was different from the daily neck pain she experienced.

¶ 21    Plaintiff testified that since 2024, her life had been "getting harder." She hoped "things [were] going to get better" but realized she may "just get used to them and accustomed to them" and would "keep moving forward." Plaintiff visited Greece a "couple weeks" before trial. She flew to Greece by herself with "a small carry-on." Plaintiff's father and bartender Lilian Leung ran the bar while plaintiff was on vacation. Plaintiff also traveled to Atlanta because her "nephew graduated from the Army." In addition, plaintiff and her friend Debbie took three to four trips over approximately four years.

¶ 22                                2. Dr. Mark Sokolowski

¶ 23    Dr. Sokolowski is an orthopedic surgeon. He first saw plaintiff on April 5, 2021. Dr. Sokolowski observed that plaintiff had limited range of motion in her left shoulder and found "clinical evidence of left rotator cuff tendonitis, cervical radiculopathy, [and] nerve impingement [i]n her neck." Dr. Sokolowski prescribed physical therapy for plaintiff's "neck, her left shoulder, left elbow, and the numbness and tingling in her arm coming from the elbow."

¶ 24    Dr. Sokolowski saw plaintiff again approximately six weeks later in May 2021. Plaintiff reported significant left shoulder and elbow pain, which physical therapy had not improved. An MRI showed tears in plaintiff's left bicep tendon and supraspinatus muscle, which is one of the rotator cuff muscles. Dr. Sokolowski then referred plaintiff to Dr. Tu. Plaintiff completed physical therapy that Dr. Sokolowski prescribed in September 2021. Between April and September 2021, plaintiff attended 25 to 30 physical therapy sessions.

¶ 25    Dr. Tu initially gave plaintiff a shoulder injection and then performed shoulder surgery on January 14, 2022. On February 16, 2022, Dr. Tu discharged plaintiff from the postoperative physical therapy he prescribed. Discharge records stated that plaintiff was "much better," had no pain, and had full range of motion. However, she did have weakness in abduction, which is moving the arm away from the body.

¶ 26    Plaintiff returned to Dr. Sokolowski on June 11, 2024. She underwent an MRI on July 7, 2024, which showed "narrowing of the spinal canal" and mild herniation in her neck. Those conditions had not improved since an MRI at the emergency room on March 31, 2021, first documented them.

¶ 27    Dr. Sokolowski last saw plaintiff on August 20, 2024. Plaintiff had nerve pain radiating from her neck to her left arm, severe carpal tunnel in her left arm, left shoulder impingement, and "ongoing rotator cuff tendonitis." Dr. Sokolowski opined that the automobile accident caused these conditions.

¶ 28    Dr. Sokolowski acknowledged that plaintiff's long work hours could cause pain and soreness. However, he found it significant that her pain appeared in the exact same location as her injuries; namely, her left shoulder and neck. By contrast, repetitive motion injuries from long work hours would likely affect both arms equally.

¶ 29                                    3. Dr. Kevin Tu

¶ 30    Dr. Tu testified by video-recorded evidence deposition, but the record contains no reports of proceedings or a bystander's report for the day of trial on which plaintiff presented his evidence deposition. However, the record does include a transcript of Dr. Tu's evidence deposition. That transcript contains a handful of markings that appear to indicate defendant's objections, although the record does not explain what those markings mean or how the trial court ruled on them. As best we can tell, the jury heard Dr. Tu's evidence deposition with minimal omissions. Because defendant is the appellant, we must resolve any doubts arising from the incompleteness of the record against her. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). So, we set out all unmarked portions of Dr. Tu's evidence deposition.

¶ 31    Dr. Tu is a board-certified orthopedic surgeon. Plaintiff was 50 years old when Dr. Tu first examined her on June 16, 2021. Plaintiff complained of pain in her left shoulder and elbow. Dr. Tu initially diagnosed plaintiff with an impingement injury to her left shoulder and gave her a lidocaine and cortisone injection to decrease pain and inflammation. Dr. Tu saw plaintiff again on

September 15, 2021. She reported that the injection had improved her pain for a month, but it returned and worsened thereafter. On September 29, 2021, plaintiff's left shoulder and elbow ranges of motion were within normal limits, but she was still experiencing pain. Dr. Tu recommended treatment options including further physical therapy, further injections, and surgery. Plaintiff decided to undergo surgery, which Dr. Tu performed on January 14, 2022.

¶ 32    During surgery, Dr. Tu examined plaintiff's left shoulder joint using a small camera. He observed several injuries consistent with the pain plaintiff described: an impingement injury, a partial thickness rotator cuff tear, and synovitis inflammation. Dr. Tu observed "a tear in the supraspinatus, which is the muscle that comes from over the shoulder and it goes under and connects to the top of the shoulder joint," as well as "a tear in the biceps tendon." Dr. Tu opined that the automobile accident caused "some of the acute damage" to plaintiff's left shoulder. He reviewed a video of the accident, and it appeared to him that plaintiff's left arm was "torqued" during the injury.

¶ 33    Dr. Tu surgically removed the damaged tissue from plaintiff's supraspinatus muscle and bicep tendon. He also removed plaintiff's bursa, which is a sac above the rotator cuff, due to inflammation. Additionally, Dr. Tu removed six to nine millimeters of plaintiff's clavicle, which is the collarbone.

¶ 34    During surgery, Dr. Tu also observed chronic conditions in plaintiff's left shoulder, including "early arthritic changes," "loose bodies," and "changes at the [acromioclavicular or AC] joint," which is where the collarbone joins the shoulder. These chronic conditions existed in plaintiff's shoulder before the accident; the accident did not cause them. Dr. Tu removed the loose

bodies and inflammatory tissue because chronic conditions can cause pain. However, he noted that plaintiff did not experience pain due to her chronic shoulder conditions before the accident.

¶ 35    Plaintiff's surgery was an outpatient procedure that lasted one to two hours. Dr. Tu did not make major incisions in plaintiff's shoulder; he performed surgery through "three small arthroscopic portals." There were no complications and surgery was successful. Dr. Tu prescribed post-surgery pain medications, but plaintiff did not order any refills of those medications.

¶ 36    When Dr. Tu next saw plaintiff on January 19, 2022, her pain had "improved significantly." On February 16, 2022, plaintiff's prognosis was "excellent," so Dr. Tu discharged her from his care.

¶ 37    In November 2023, plaintiff returned to Dr. Tu complaining of increasing pain in her left shoulder. Dr. Tu examined plaintiff again on February 21, 2024, and April 17, 2024. Plaintiff's "range of motion had decreased just a tad bit" and she was "mildly positive" for shoulder impingement but did not have "significant symptoms." Dr. Tu gave plaintiff a cortisone injection for her shoulder pain. Dr. Tu opined that the pain plaintiff experienced as of 2024 was related to the March 31, 2021, automobile accident. He also opined that plaintiff had reached "maximum medical improvement," meaning that her remaining symptoms would be permanent.

¶ 38                                    4. Lilian Leung

¶ 39    Lilian Leung testified that she worked as a bartender at All Inn. Plaintiff was Leung's manager. Before the accident, plaintiff took inventory, cleaned beer coolers and bathrooms, mopped, and did general manual labor at the bar. After the accident, plaintiff "was in a lot of pain" and could not lift or straighten her left arm, so Leung helped her with physical tasks. At the time

of trial, plaintiff still had bar staff stock inventory "because she ha[d] pain in her shoulder and she c[ould]n't lift her arm." Plaintiff took "a lot of ibuprofen" for pain at work.

¶ 40                                  5. Efterpi "Debbie" Ress

¶ 41    Efterpi "Debbie" Ress testified that she is plaintiff's best friend of approximately 40 years. Ress typically saw plaintiff once or twice a week. Before the accident, plaintiff was "active" and, at work, there was "nothing she d[idn't] do from cleaning the urinals, the toilets, mopping, sweeping, picking up beer cases." After surgery, plaintiff "would ask everybody to help her. She c[ould]n't lift a case of beer. She couldn't mop. She couldn't sweep every night until 3:00 in the morning." Overall, plaintiff changed from being "self-sufficient to needing help constantly" because she could not lift her left arm. Ress and plaintiff visited Greece together "a few weeks" before trial. They occasionally took weekend trips to destinations such as the Texas State Fair.

¶ 42                                  6. Joseph Cosentino

¶ 43    Joseph Cosentino is plaintiff's father. He testified that before the accident, plaintiff was "vibrant" and "tough." After the accident, she "was not herself" and "couldn't hardly move around too much and she was in a lot of pain," which lasted years. Plaintiff could only do mental tasks at work and "was incapacitated to a certain extent" physically.

¶ 44                                  7. Anthony Cosentino

¶ 45    Anthony Cosentino is plaintiff's nephew. He testified that he moved in with plaintiff to help her after the accident and again after surgery. Plaintiff "couldn't really move" in the mornings, so Anthony handled tasks such as making coffee, doing laundry, picking up prescriptions, and changing clothes, including helping plaintiff put on her bra. Plaintiff and Anthony stopped living together in early 2022.

¶ 46                                8. Toni Cosentino

¶ 47    Plaintiff's sister Toni Cosentino testified by video-recorded evidence deposition. However, the record does not contain reports of proceedings, the video recording, a deposition transcript, or a bystander's report reflecting Toni's testimony. Therefore, we have no basis for setting out her testimony.

¶ 48                                9. Dr. Klaud Miller

¶ 49    Defendant retained orthopedic surgeon Dr. Miller as an expert witness and presented his testimony by evidence deposition. The record includes a transcript of Dr. Miller's evidence deposition, marked with green highlights that may indicate designations of testimony the jury heard. But because the record does not include the trial court's rulings on evidence deposition designations and objections, we cannot determine with certainty which portions of Dr. Miller's evidence deposition the jury heard. We must resolve this uncertainty against defendant as the appellant. See *id.* Therefore, we set out only the portions of Dr. Miller's testimony the parties agree the jury heard. Dr. Miller opined that any ongoing pain plaintiff experienced after her recovery from surgery is permanent but is due to preexisting arthritis in her left shoulder, not the March 31, 2021, accident.

¶ 50                         10. Closing Arguments and Verdict

¶ 51    The verdict form listed three categories of damages the jury could award: (1) "Loss of a normal life experienced and reasonably certain to be experienced in the future," (2) "The pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries," and (3) "The reasonable expense[s] of necessary medical care, treatment, and services received." The parties stipulated that plaintiff's medical expenses were $62,608.96, so the jury

decided only damages for pain and suffering and loss of a normal life. Defendant did not object to this verdict form or propose an alternate.

¶ 52    In closing argument, plaintiff did not request a specific amount of damages. However, she argued that the damages awarded needed to "last" for 29 years because plaintiff, who was 53 years old at the time of trial, expected to live for another 29 years. This figure came from "government life tables" of which the trial court took judicial notice without objection from defendant.

¶ 53    Defendant "admit[ted] damages up until February 16, 2022," when Dr. Tu discharged plaintiff from his care and from physical therapy, because plaintiff was pain-free and had full range of motion on that date. Defendant argued that the jury should not award plaintiff damages for the rest of her life because she was still able to work long shifts at the bar, showing that her injuries were not permanent. Defendant contended that plaintiff did not seek medical treatment between February 2022 and November 2023 because she was not in pain during that time. Rather, she began seeing her doctors again in 2023 and 2024 because the trial of this case was approaching. Defendant argued that the jury should award no more than $10,000 each for pain and suffering and loss of a normal life, for a total damages award of $82,608.96 including medical expenses.

¶ 54    The jury awarded $2,562,417.92 in damages, consisting of $1,614,808.96 for pain and suffering, $885,000 for loss of a normal life, and $62,608.96 for medical expenses.

¶ 55                                    D. Posttrial Motion

¶ 56    On October 18, 2024, defendant filed a motion for remittitur or a new trial. Relevant here, defendant argued that the jury's $1,614,808.96 award for pain and suffering was almost 26 times her medical expenses and the $885,000 award for loss of a normal life was more than 12 times her medical expenses. Defendant also contended the evidence established that (1) plaintiff's left

shoulder had preexisting "arthritic and degenerative issues" the automobile accident did not cause, (2) plaintiff would not require any further medical treatment and would experience only "intermittent" shoulder pain, and (3) plaintiff was able to function normally aside from lifting heavy objects and even enjoyed a vacation in Greece just before trial. Finally, defendant argued that "the jury may likely have been prejudiced by the numerous lay witnesses testifying to Plaintiff's pain and suffering, and the emotional aspects of these witnesses and Plaintiff's counsel during closing."

¶ 57    On October 24 or 25, 2024, plaintiff "responded" to defendant's posttrial motion by filing screenshots from the doctors' evidence depositions and a copy of this court's opinion in *Aguilar-Santos v. Briner*, 2017 IL App (1st) 153593. In that case, this court affirmed a jury's award of $835,500 for pain and suffering and loss of a normal life arising out of an automobile accident. *Id.* ¶¶ 2, 40, 78.

¶ 58    On October 25, 2024, the court entered and continued defendant's posttrial motion. The record does not include reports of proceedings or a bystander's report for that hearing. However, the court's written order reflects that it required defendant to file some type of supplemental briefing by December 16, 2024.

¶ 59    On December 16, 2024, defendant filed a "reply" in support of her posttrial motion. Defendant distinguished *Aguilar-Santos*, arguing that the plaintiff in that case underwent more medical treatment, was never pain-free, and was taking pain medication up to the time of trial. By contrast, in this case, there was a "distinct cutoff point in the pain Plaintiff experienced;" namely, February 16, 2022. Defendant contended that the jury improperly awarded damages for pain that plaintiff's preexisting arthritis caused. Defendant argued that "a more logical award amount would

be the [*sic*] 'three times the sum of medical expenses,' " quoting *Dale v. Luhr Brothers, Inc.*, 158 Ill. App. 3d 402, 410 (1987).

¶ 60    On January 6, 2025, plaintiff filed a memorandum in opposition to defendant's posttrial motion. Plaintiff's memorandum included an excerpt from the October 25, 2024, hearing, reflecting that the court had ordered defendant to file a supplemental brief identifying "an amount that [defendant] thinks would be reasonable, or that the evidence supported." Plaintiff argued that defendant failed to do so. In addition, plaintiff contended that the jury had already heard and rejected defendant's theory that plaintiff's ongoing pain was due to preexisting arthritis and not the automobile accident.

¶ 61    The court held oral argument on defendant's posttrial motion on January 28, 2025. Defendant acknowledged that the court had ordered her to "suggest[ ] a remittitur amount" but explained she could not do so because her insurer had not given her such authority. Defendant argued there was no expert medical testimony establishing that plaintiff's "permanent" pain was due to the injuries she sustained in the automobile accident. Defendant contended that plaintiff's lay witnesses—her friends and family—swayed the jury's emotions. Plaintiff reiterated the arguments she made in her memorandum and highlighted that defendant never objected to the verdict form. The court asked whether plaintiff ever requested the jury to award a specific amount. Plaintiff responded that she requested "millions of dollars" in her opening statement but never requested a specific amount.

¶ 62    The court denied defendant's posttrial motion. The court reasoned as follows:

> "I agree with the defense in that the verdict, to me, seemed high. But as the judge
> in a jury trial, it's not—I'm not the trier of fact. I'm not the person who decides. And I also

see the arguments that defense made. The fact is, however, that the jury heard those arguments and while those arguments might have swayed me, it did not sway the jury. And I have no evidence, saw any evidence that the jury was motivated by prejudice or motivated by sympathy or something unfair.

The jury was presented with this case and I believe presented this case well from both sides and the jury made a decision. And I do not believe that that decision rises to the level that would justify the Court either reducing the damages or giving defendant a new trial. I think that the jury's verdict has to be respected by this Court, so I'm going to respectfully deny defendant's motion for remittitur or any alternative motion for new trial."

¶ 63     Defendant timely appealed.

¶ 64                                    II. ANALYSIS

¶ 65     Defendant contends the trial court abused its discretion in denying her posttrial motion seeking remittitur or a new trial.

¶ 66                              A. Incomplete Record

¶ 67     Before we turn to defendant's arguments, we address plaintiff's contention that we should affirm pursuant to *Foutch* because defendant has not presented a complete record of the trial. *Foutch* holds that the

> "appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch*, 99 Ill. 2d at 391-92.

¶ 68    There is no question the record on appeal is incomplete. Defendant, the appellant, did not provide reports of proceedings or a bystander's report for the entire first day of trial, including the trial court's pretrial evidentiary rulings and the parties' opening statements. Defendant has not provided any of the exhibits the parties moved into evidence, including a video of the automobile accident that gave rise to this case. In addition, defendant did not provide any record of Toni Cosentino's testimony, which may have affected the jury's damages award as Toni was the first witness to see plaintiff at the hospital after the accident.

¶ 69    Defendant's submission of an incomplete record makes it more difficult to review her requests for remittitur or a new trial. The remittitur analysis requires us to "carefully examine the particular evidence and circumstances of the case." *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 234 (2010). But defendant has not provided a complete record of the evidence and circumstances of trial. Similarly, the new trial analysis requires us to determine whether the jury's verdict was against the manifest weight of the evidence. *Aguilar-Santos*, 2017 IL App (1st) 153593, ¶ 76. We do not have a complete picture of the evidence in this case, so it is more difficult to assess the evidence's weight. And ultimately, we are deciding whether the trial court abused its discretion in denying defendant's posttrial motion. *Id.* The court's exercise of discretion was based on what it observed at trial, but we do not have a complete record of what the court observed during trial.

¶ 70    By submitting an incomplete record, defendant risks dismissal of her appeal. See *Hassard v. DS Retail, LLC*, 2023 IL App (4th) 220687, ¶ 33. But, we will not take that drastic measure here. First, plaintiff does not request dismissal based on the incomplete record; rather, she requests that we "affirm[ ] *in toto*." Although the record is incomplete, it is sufficient for us to determine the

overall weight of the evidence, whether that evidence supported the jury's verdict and, in turn, whether the trial court abused its discretion in denying defendant's posttrial motion. As explained above, we resolve any doubts arising from the incomplete record against defendant. See *Foutch*, 99 Ill. 2d at 391-92.

¶ 71                                    B. Remittitur or New Trial

¶ 72    Defendant makes essentially the same arguments in support of remittitur and a new trial. As she puts it, "[m]any of the reasons, if not all, cited by [defendant] in seeking a remittitur apply with equal force to [her] sought after relief of a new trial on the issue of damages." Therefore, we address remittitur and a new trial together.

¶ 73    A court must give great deference to a jury's damages award. *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 90 (citing, *inter alia*, *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997)). When the jury's award falls within a flexible range of conclusions that the evidence reasonably supports, a court will not grant remittitur. *Aguilar-Santos*, 2017 IL App (1st) 153593, ¶ 76. A court will grant remittitur only if the jury's damages award "is so excessive that it indicates that the jury was moved by passion or prejudice or unless it exceeds the necessarily flexible limits of fair and reasonable compensation or is so large that it shocks the judicial conscience." (Internal quotation marks omitted.) *Id.*

¶ 74    "A trial court should order a new trial if, after weighing the evidence, the court determines that the jury's verdict is contrary to the manifest weight of the evidence." *Id.* (citing *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992)). "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the jury's findings are unreasonable, arbitrary, or not based on the evidence." *Id.* (citing *Redmond v. Socha*, 216 Ill. 2d 622, 651 (2005)).

¶ 75 We review a trial court's rulings on a motion for remittitur and a motion for a new trial for an abuse of discretion. *Id.* "In determining whether the trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial." *Young*, 2015 IL App (1st) 131887, ¶ 46 (quoting *Maple*, 151 Ill. 2d at 455). A trial court abuses its discretion when no reasonable person would adopt the trial court's view. *Gomez v. The Finishing Co., Inc.*, 369 Ill. App. 3d 711, 718 (2006).

¶ 76                                        1. Pain and Suffering

¶ 77 The jury awarded $1,614,808.96 for the pain and suffering plaintiff experienced and is reasonably certain to experience in the future.

¶ 78 Pain and suffering are compensable damages. Illinois Pattern Jury Instructions, Civil, 30.05 (2000). "Damages for pain and suffering are proper where there is evidence of a physical injury." *Rheinheimer v. Village of Crestwood*, 291 Ill. App. 3d 462, 475 (1997) (citing *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 546 (1996)). "Evidence of future pain and suffering may be rendered by an expert, elicited from the plaintiff, or inferred from the nature of an injury." (Internal citations omitted.) *Neyzelman by Neyzelman v. Treitman*, 273 Ill. App. 3d 511, 518 (1995).

¶ 79 There is no dispute plaintiff suffered physical injuries in the March 31, 2021, accident, so damages for pain and suffering were appropriate. See *Rheinheimer*, 291 Ill. App. 3d at 475. Plaintiff properly presented evidence of her pain and suffering through her own testimony and the testimony of two treating experts, Dr. Sokolowski and Dr. Tu. See *Neyzelman*, 273 Ill. App. 3d at 518. Dr. Sokolowski and Dr. Tu agreed that plaintiff suffered an impingement injury, a torn bicep, and a torn supraspinatus in her left arm and shoulder.

¶ 80    The evidence established that plaintiff experienced almost constant pain during the three and a half years between the accident on March 31, 2021, and trial in late September 2024. Plaintiff testified that she suffered "pinching" left shoulder pain, "pressure" and "pinching" in her neck that never improved despite treatment, and pain when trying to raise her left arm. Dr. Sokolowski testified that plaintiff was still experiencing pain radiating from her neck to her left arm in August 2024, a month before trial.

¶ 81    Plaintiff's reprieves from pain were few and brief. Plaintiff was pain-free for approximately one month after Dr. Tu gave her the first cortisone injection, from June 16, 2021, to mid-July 2021. Plaintiff's pain also improved following surgery on January 14, 2022, and that improvement lasted until at least February 16, 2022, when Dr. Tu discharged her. So, in the three and a half years between the accident and trial, plaintiff was fully pain-free for approximately two months, or less than 5% of the time.

¶ 82    Furthermore, the evidence established that plaintiff's pain will persist into the future. Dr. Tu testified that plaintiff has reached "maximum medical improvement," so the pain she experiences now will likely be permanent. Even defense expert Dr. Miller agreed that plaintiff's pain is permanent. The jury heard, and there appears to be no dispute, that plaintiff's life expectancy is approximately 29 years. The jury's award does not strike us as shocking considering plaintiff's demanding service industry job.

¶ 83    To that point, the jury heard evidence about the daily context in which plaintiff has experienced and will continue to experience pain. Plaintiff works in a bar, in a position that requires physical labor as well as long shifts that can exceed 10 hours a day, seven days a week, late at night and into the early morning hours. Service industry jobs can be physically taxing even for

young and healthy people, to say nothing of a middle-aged person with permanent shoulder injuries. Plaintiff testified that she was sore at work every day. Bartender Lilian Leung confirmed that plaintiff suffered "a lot of pain" at work and frequently took ibuprofen for it. The jury could have properly considered plaintiff's demanding job in compensating her for past and future pain and suffering.

¶ 84   Defendant argues that "the case was close" regarding the cause of plaintiff's pain. Defendant points out that while Dr. Sokolowski opined that plaintiff's pain arose from the injuries the accident caused, Dr. Miller opined that plaintiff's pain was due to preexisting arthritis. Defendant contends that because the evidence of causation was equal, the jury must have based its award on "passion." We disagree. First, this issue was not a one-on-one battle of the experts. In addition to Dr. Sokolowski, Dr. Tu testified that the pain plaintiff experienced as of 2024 was related to the accident. He also highlighted that plaintiff did not experience any arthritis pain before the accident. Regardless of how many experts testified, the jury was responsible for evaluating their competing opinions as to causation. See *Snelson v. Kamm*, 204 Ill. 2d 1, 27 (2003) ("the weight to be assigned to an expert opinion is for the jury to determine in light of the expert's credentials and the factual basis of his opinion."); *Bowman v. University of Chicago Hospitals*, 366 Ill. App. 3d 577, 584 (2006) ("It is the jury's role to assess the weight and sufficiency of the evidence, including the credibility of the experts' testimony, and to resolve the factual question of proximate cause."). We do not reweigh the experts' competing testimony as to the cause of plaintiff's pain after February 16, 2022.[2] "Reviewing courts are required to scrutinize

---

[2]We do note defendant's somewhat contradictory position here. On the one hand, defendant claims that plaintiff experienced *no* pain on or after February 16, 2022. On the other hand, defendant concedes that plaintiff *did* experience pain after that date but claims that pain was due to preexisting arthritis in her shoulder.

the evidence but will not sit as a second jury and reweigh the evidence or reevaluate the credibility of witnesses, especially where conflicting expert testimony is introduced at trial, which is within the province of the jury as the trier of fact." *Hajian v. Holy Family Hospital*, 273 Ill. App. 3d 932, 940 (1995). As the factfinder, the jury was in the best position to resolve conflicts between the experts' testimony. See *Flynn v. Cohn*, 154 Ill. 2d 160, 169 (1992).

¶ 85    Defendant highlights the "gap" between plaintiff's discharge from Dr. Tu's care on February 16, 2022, and when she next sought medical treatment on November 15, 2023. The jury heard and rejected defendant's theory that plaintiff was not actually in pain during that "gap" and only returned to her doctors because trial was approaching. The evidence supported the jury's decision to reject defendant's theory. Plaintiff testified that she *was* in pain between February 2022 and November 2023. Her neck pain never subsided and her shoulder pain "started creeping back in" after Dr. Tu discharged her on February 16, 2022. That was why she sought treatment from Dr. Tu again on November 15, 2023.

¶ 86    Defendant contends that the verdict form did not distinguish between past and future pain and suffering, thereby creating "ambiguity" in the damages award. But defendant did not object to the verdict form or propose an alternate. "On appeal, a litigant waives the right to object to *** verdict forms that are given to a jury when the party fails to make a specific objection during the jury-instruction conference or when the form is read to the jury." *Compton v. Ubilluz,* 353 Ill. App. 3d 863, 869 (2004). "Even if the litigant properly objects to [the] verdict form, the litigant must still submit a remedial *** verdict form to the trial court." *Id.* Defendant did neither, so she has forfeited this issue on appeal. See *id.* Accordingly, we affirm the jury's award for pain and suffering.

¶ 87                                    2. Loss of a Normal Life

¶ 88    The jury awarded $885,000 for loss of a normal life plaintiff experienced and was reasonably certain to experience in the future.

¶ 89    Loss of a normal life is "the temporary or permanent diminished ability to enjoy life" and "includes a person's inability to pursue the pleasurable aspects of life." Illinois Pattern Jury Instructions, Civil, 30.04.02 (2008); *Smith v. City of Evanston*, 260 Ill. App. 3d 925, 936-38 (1994). Loss of a normal life often focuses on the plaintiff's "recreation or hobbies" (*Smith*, 260 Ill. App. 3d at 936-38), but it is a broad category that compensates a plaintiff for a change in her lifestyle (*Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1135 (2000)). Loss of a normal life can include a reduction in physical activity after an accident. *Shaheen v. Advantage Moving and Storage, Inc.*, 369 Ill. App. 3d 535, 546 (2006).

¶ 90    For some people, their work *is* their life. That appears to be the case here. The evidence established that plaintiff places great value on her work ethic and self-sufficiency. She views managing the All Inn bar as her duty to her father, sees herself as personally responsible for everything at the bar, rarely takes days off, and devotes most of her waking hours to the bar's operation. Plaintiff, Leung, and Ress all testified that plaintiff's injuries and pain have forced her to limit her activities at work and to frequently ask bar staff for help. As plaintiff's best friend Ress put it, plaintiff went from being "self-sufficient to needing help constantly." A reasonable jury could conclude that plaintiff's diminished ability to run the family business, to which she devotes much of her life and her identity, warranted significant compensation for loss of a normal life.

¶ 91    Plaintiff's injuries have also affected her ability to take care of herself and her father. Plaintiff struggled with physical chores such as carrying her father's laundry and groceries. Her

ability to exercise diminished and she gained weight. Plaintiff had difficulty grooming and dressing herself, to the point that her nephew Anthony had to help her put on a bra. Plaintiff described herself as "not the same" and "a little bit depressed." A reasonable jury could find that these disruptions to plaintiff's personal life, while relatively minor individually, were significant in the aggregate and supported substantial compensation for loss of a normal life. See *Aguilar-Santos*, 2017 IL App (1st) 153593, ¶ 78 (the jury properly compensated the plaintiff for loss of a normal life where the plaintiff "testified that although she is able to perform household chores, she does so with difficulty because of the pain symptoms.").

¶ 92 To be clear, the award for loss of a normal life was not compensation for lost wages, an inability to work, or even physical pain plaintiff experiences at work. Rather, the award recognized that plaintiff's work ethic and self-sufficiency are central to her identity, and her injuries have forced significant and frustrating changes to her lifestyle at work and home. Accordingly, the jury's award for loss of a normal life does not warrant remittitur or a new trial, and the trial court did not abuse its discretion by denying defendant's posttrial motion.

¶ 93                             3. Defendant's Arguments

¶ 94 We now address defendant's remaining arguments, which are not specific to either category of damages.

¶ 95 Defendant argues that Dr. Sokolowski improperly "advocated" for plaintiff by discussing "last minute pathology such as carpal tunnel and cubital [tunnel] pathology which is not tied to the shoulder injury and the neck sprain suffered by [plaintiff]." During trial, defendant objected to Dr. Sokolowski's testimony that plaintiff would require surgery for carpal tunnel syndrome in her left arm. The trial court sustained that objection in the jury's presence. Defendant now complains that

the trial court did not specifically instruct the jury to "disregard" that testimony. But defendant never asked the court to issue such an instruction and there is no indication that the lack of one deprived defendant of a fair trial. See *Bosel v. Marriott Corp.*, 65 Ill. App. 3d 649, 657 (1978). Put differently, the trial court did not abuse its discretion by not doing something defendant never asked it to do.

¶ 96　Defendant complains that the jury "repeatedly" viewed a video of the March 31, 2021, automobile accident. We see nothing inherently improper about the jury viewing of a video of the accident that gave rise to this incident. In any event, defendant did not include that video in the record on appeal, so we have no basis for finding that the jury "repeatedly" viewing it was somehow unduly prejudicial to defendant.

¶ 97　Defendant argues that plaintiff never suggested a specific amount of damages the jury should award; therefore, "the jury's verdict was based on nothing more than its passion." We are surprised that a defendant is complaining that a plaintiff did *not* suggest a specific damages award. Regardless, it "is *permissible* for trial counsel to suggest a lump sum amount for pain and suffering damages" ((emphasis added.) *Ramirez v. City of Chicago*, 318 Ill. App. 3d 18, 28 (2000)), but defendant cites no authority for the proposition that a plaintiff *must* suggest a specific amount of damages.

¶ 98　Defendant also complains about certain terms plaintiff's counsel used during trial. For example, she objects to plaintiff's counsel characterizing supraspinatus surgery as an "amputation." Plaintiff's counsel did not actually compare plaintiff's surgery to an amputation. During Dr. Tu's evidence deposition, plaintiff's counsel used amputation as an example of how a surgery can be medically "successful," *i.e.*, without complications, while not restoring the patient

to their condition before the surgery. Defendant also complains about plaintiff's counsel calling Dr. Miller a "jukebox witness." Plaintiff's counsel did use that term, which apparently refers to expert witnesses who "play whatever tune you want" when you pay them. But defendant never objected to either of these terms, so she has forfeited these complaints. See *Snelson*, 204 Ill. 2d at 25.

¶ 99 Finally, the cases defendant cites are distinguishable and do not compel remittitur or a new trial. *Maple*, 151 Ill. 2d at 456-60 (upholding a defense verdict where there was conflicting evidence as to whether the plaintiffs suffered any injuries in an automobile accident); *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470-72 (1992) (upholding a $3 million verdict reduced by 50% due to the decedent's contributory negligence in trespassing on electrified tracks); *Mikolajczyk v. Ford Motor Co.*, 369 Ill. App. 3d 78, 105-108 (2006) (finding a $25 million award for loss of society excessive).

¶ 100 In this case, the jury heard from three expert witnesses, including a defense expert, as well as six fact witnesses. We are confident the jury received a complete picture of plaintiff's injuries, the pain they caused, and their impact on her life. Notably, the jury did not ask a single question during their deliberations, nor did they express any doubt or division. We agree with the trial court's analysis: The jury's damages award is high, perhaps even surprisingly so, but it does not shock the judicial conscience. See *Aguilar-Santos*, 2017 IL App (1st) 153593, ¶ 76. There is nothing in the record upon which we could base a conclusion that the jury's verdict was the product of passion or prejudice. *Id.* On the contrary, the record suggests that the jury based its verdict on a robust presentation of evidence. Accordingly, the trial court did not abuse its discretion in denying defendant's motion for remittitur or a new trial.

¶ 101                                III. CONCLUSION

¶ 102   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 103   Affirmed.